# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville April 23, 2013

## STATE OF TENNESSEE v. SEYMORE S. STATEN

### Appeal from the Circuit Court for Williamson County
### No. I-CR082827    Robbie Beal, Judge

### No. M2012-01306-CCA-R3-CD - Filed February 20, 2014

The Defendant, Seymore S. Staten, was convicted by a Williamson County Circuit Court jury of reckless aggravated assault, a Class D felony. *See* T.C.A. § 39-13-102 (2010). He was sentenced as a Range I, standard offender to three years' confinement to be served consecutively to a previously imposed eighty-seven-month federal sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction and (2) his right to a speedy trial was violated. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Casey C. Truelove, Brentwood, Tennessee, for the appellant, Seymore S. Staten.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Assistant Attorney General; Kim R. Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the non-fatal shooting of Eric Lee. At the trial, Franklin Police Officer Tammy Crowe testified that at 10:44 p.m. on March 31, 2007, she responded to a shots-fired call on Fairground Street. She said Fairground Street was a typical neighborhood street with a nearby church, nursing home, and vacant lot. She said that when she arrived, she saw people screaming, running, and driving away from the area and a large group of people standing in the street in front of the vacant lot. She learned that a party had ended and someone had been shot. She found one shell casing in the street near the house where the shooting occurred and blood spatter on the ground near the shell casing. She questioned

people who were at the scene and took statements from those who witnessed the shooting.

Officer Crowe testified that vehicles parked along the street in the vicinity were considered part of the crime scene and that owners of those vehicles were denied access. She said that about 1:00 a.m., crime scene investigators processed a car parked inside the crime scene and that the owner, Tywana Staten, asked why the police were searching it.

On cross-examination, Officer Crowe testified that the shell casing was found in the middle of the street. She said the detective assigned to the case decided what, if any, testing needed to be performed on the casing. She said that it was dark when she arrived at the scene and that she found the blood spatter and the casing with the aid of a flashlight. She did not find a gun.

Former Franklin Police Detective Kevin Adams testified that he was the lead detective assigned to this case, that he responded to a shots-fired call, and that the scene was chaotic when he arrived. He said the shell casing found at the scene was a .40 caliber casing. He photographed the yard of the house where the party was held and a portion of the street in front of the house. He said the evidence found at the scene and the witnesses' statements showed where the shooting occurred. He photographed tire marks in the street and said it looked as though a vehicle sped away. He also photographed blood spatter found in the street and a shirt found in the yard. He was unable to determine if the shirt was related to the shooting but noted it was inside the scene.

Mr. Adams testified that it was dark when he arrived but that there were street lights and lighting from the surrounding houses. He identified a photograph of a white Lexus parked inside the crime scene, which he later determined was owned by Tywana Staten. He said the Lexus was initially parked in the yard and close to the blood spatter. He said that the Lexus was abandoned and that an inventory search was performed to determine the owner. He did not know how long he had been at the scene when Ms. Staten arrived. He said that a drawer under the driver's seat was pulled out and that it was a good place to hide an object.

Mr. Adams testified that it took several hours to process the scene. He did not find a gun or the bullet from the fired shell casing. He said a ballistic analysis was not performed on the shell casing because the gun was never found.

On cross-examination, Mr. Adams identified a photograph of a plastic bag found near blood spatter and said that he did not know if anyone looked inside the bag or collected it as evidence. He said several items were recovered from the victim at the hospital. He said that the bullet casing was not checked for fingerprints and that it was difficult to obtain fingerprints on that kind of item. He denied the shirt was analyzed for the presence of blood.

He said that loose change was found inside the drawer under the driver's seat of the Lexus. He did not know if any additional items were found there. He agreed the Defendant did not return to the Lexus while the police searched it. He stated that other police officers spoke to the witnesses at the scene and that he did not participate in obtaining formal statements.

On redirect examination, Mr. Adams testified that bullet casings rarely provided fingerprints and that any analysis usually showed a partial fingerprint or a smudge because of the manner in which people handled bullets. On recross-examination, he agreed no fingerprint or serology analysis was performed on the recovered evidence. On further direct examination, Mr. Adams showed the jury the shirt recovered from the scene. He said the shirt was never analyzed because it was a white shirt with no visible blood. On further cross-examination, he stated that the shirt had "reddish-brownish" stains and that the shirt looked dirty. He said none of the stains were analyzed.

Wanda Waters testified that she knew the Defendant from "around town" and that the victim was her cousin. She said that she was on Fairground Street the night of the shooting because she received a phone call from her daughter and sister, who told her they had been in a "fight" with two other women. She said that after she arrived on Fairground Street, she spoke to her brother, Fred Lee, and that the Defendant "popped up out of nowhere" with a gun and held it to Mr. Lee's head. She said the Defendant asked, "[W]hy'd you hit my b---- for?" She said her brother denied hitting the Defendant's girlfriend. She said the victim stood to her left during the confrontation. She said that she asked the Defendant why he was "doing this," that the Defendant waved the gun around and fired it, and that the victim was shot in the foot and "slid down" to the ground. She said that the victim hopped and scooted to a car parked on the side of the street and that the Defendant fired the gun again. She said that Edward Rucker grabbed her and pulled her to a safe area. She said the Defendant looked at her and ran away.

Ms. Waters testified that people gathered on Fairground Street for a block party and that the house where people were hosting the party was located two houses down from the nursing home. She said that the street lights worked that night and that she could see people's faces. She said that when she arrived, some people were leaving and others were standing in the yard. She said she was scared when she saw the gun. She said the Defendant backed away from her brother and shot the victim. She did not see how the Defendant held the gun when he shot the victim.

On cross-examination, Ms. Waters testified that on the night of the shooting, her daughter, Darissa Lee, and sister, Jessica Cheatham, fought with the Defendant's former girlfriend and the girlfriend's sister. She said that to her knowledge, her brother did not intervene in the fight. She agreed her youngest son, William Lee, was also at the party and

said he did not intervene in the fight. When confronted with her testimony at the preliminary hearing, she agreed the transcript showed that she said the Defendant pushed her brother. She said, though, that at the preliminary hearing, she demonstrated with her hand that the Defendant placed a gun to her brother's head. She said that no one was standing behind the Defendant at the time of the shooting.

Ms. Waters testified that to her knowledge, neither she nor her family, including the victim, had a problem with the Defendant before the night of the shooting. She said that the Defendant fired the gun twice and that the shots were "on top of each other." She did not think the shooting was accidental.

On redirect examination, Ms. Waters testified that she gave similar testimony at the preliminary hearing. She said that at the preliminary hearing, she said the Defendant came out of nowhere with a gun, fired his gun twice, and shot the victim. She said that before her daughter and sister called her about the fight, she was at home putting away groceries. On recross-examination, Ms. Waters stated that when she said at the preliminary hearing that the Defendant pushed her brother, she meant the Defendant pushed the gun to her brother's head. She denied she meant the Defendant shoved her brother.

The victim testified that he lived in Lavergne, Tennessee and that on May 31, 2007, he came to Franklin for a funeral earlier that day. He said he went to a block party cookout on Fairground Street that night with his cousins Fred and Troy Lee. He said they arrived around 7:00 p.m., but he denied drinking alcohol there. He said he drank a "couple beers" earlier that afternoon. He said he knew the Defendant well enough to say hello but not personally.

The victim testified that he saw the Defendant at the block party shortly after he arrived. He said twenty or twenty-five people were at the block party. He said he and the Defendant did not argue that night. He said he was standing on the outskirts of the crowd when a fight broke out. He said someone told him the fight involved his family members. He said he saw Ms. Waters, walked to her location, and attempted to calm her and his other family members. He said that although Ms. Waters was not fighting, he attempted to pull her back from the crowd. He said that he saw the Defendant with a gun, that the Defendant waved the gun in the air, and that he threw up his hands to show everyone he did not have a gun. He said that the Defendant was aggressive and that he heard a few gunshots. He said he did not feel "the burn" in his leg immediately but felt the pain and saw the blood when he attempted to walk. He said that he stumbled away from the crowd when he realized he had been shot. He said he saw a car nearby, leaned on it, and examined his leg.

The victim testified that the pain in his leg worsened after the paramedics arrived and that he lost a lot of blood. He said that his foot was injured, too, and that his shoe held the wound together. He said he underwent surgery that night to place metal plates, bolts, and screws in his left leg and stayed in the hospital three days. He said that he had scars on both sides of his ankle and that the metal plates were slightly visible. He showed his scars to the jury. He said the bullet struck the top portion of his ankle and exited at the bottom of his foot.

The victim recalled that he testified at the preliminary hearing that he did not see the Defendant with a gun initially because it was dark outside. He stated that he did not see the gun at that time because he was too far from the Defendant. He agreed he testified at the preliminary hearing that he saw the gun at some point and that he heard the gunshot. He said he saw the gun as he moved closer to the Defendant. He did not recall telling the police when he was in the hospital that he did not know who shot him. He said he was in too much pain and did not want to talk to the police at that time. He agreed he saw the Defendant with the gun. He denied seeing anyone threaten the Defendant, falsely accusing the Defendant, and filing a civil lawsuit against the Defendant.

The victim's medical records showed that he was admitted to the hospital for a gunshot wound to the left ankle with tibia and fibula fractures. The entrance wound was approximately three-fourths of an inch in diameter, bled moderately, and was located on the "dorsal medial aspect" of the left ankle. The exit wound was "medial to the medial malleolus." The x-ray showed a "trimalleolar ankle fracture of the distal tibia" and a "transverse fracture above the tibial plafond of the lateral malleolus/fibula." He underwent an open reduction internal fixation of the distal tibia. The surgeon installed plates and screws. The victim was given intravenous antibiotics and pain medication and was required to wear a splint.

The victim testified that he was unable to work for about four months because of his injuries, that his company did not provide long- or short-term disability insurance, and that his wife was on bed rest due to pregnancy complications. He agreed they were both unable to work after the shooting.

On cross-examination, the victim was presented his testimony from the preliminary hearing. He agreed he stated at the preliminary hearing that he was told the Defendant had a gun but that he did not see it. He stated that although he testified at the hearing that he did not see the Defendant with a gun, he saw the Defendant holding a gun. He clarified that he was not looking at the Defendant at the time of the shooting because he was watching everyone. He recalled standing beside Ms. Waters and attempting to calm her and his other family members at the time of the shooting. Although he denied talking to the Defendant at

the block party, he saw the Defendant and other people attempting to hold the Defendant during the confrontation. He said that although people were holding the Defendant and attempting to calm him, the Defendant broke free.

The victim testified that he heard two gunshots. He agreed, though, that he testified at the preliminary hearing that when he was attempting to move his family members from the commotion, "a gun shot went off and [he] was shot." He agreed he testified at the preliminary hearing that he did not see the Defendant shoot him. He denied that he and the Defendant were enemies.

On redirect examination, the victim testified that he heard two gunshots and that he was not asked at the preliminary hearing how many gunshots he heard. He said that he saw the Defendant and Fred Lee arguing and that the Defendant waved a gun and made threats. He said that although he did not know any reason the Defendant would want to shoot him, it was possible the Defendant had a reason to shoot Mr. Lee based on their arguing that night. He said, though, he did not see the men touch each other.

Edward Rucker testified that he knew the Defendant and that Ms. Waters was married to his cousin. He said he attended the block party on May 31, 2007, and arrived before nightfall. He saw the Defendant at the party. He said that when he was getting ready to leave, he heard two gunshots. He said that he pulled Ms. Waters away from the commotion, that he saw "Cate" was shot, and that Cate was lying on the ground. He said that Cate was Ms. Waters's cousin but that he did not know his legal name. He said he helped Cate out of the street and behind some cars parked along the street. He said that the victim was bleeding and in pain, that he ran to his car, that he pulled his car to where the victim was located, that he grabbed a shirt to wrap around the victim's wound, that he helped the victim into his car, and that he started to drive to the hospital. He said that before they could leave the street, the police arrived. He said he planned to continue driving because the victim was bleeding, but the police stopped him. He said the paramedics took the victim to the hospital.

Mr. Rucker testified that he talked to the police about five or ten minutes after the shooting. He agreed that although he told the police that he saw "fire come from a gun," the events were "a blur" and had happened a long time ago. He recalled, though, the Defendant had the gun. He said that at the time of the shooting, the Defendant stood to his right and held a gun. He demonstrated how the Defendant held the gun and moved his hand from left to right.

On cross-examination, Mr. Rucker testified that he started to leave the block party around dusk and could still see people's faces well. He said that as he walked down the driveway of the house where everyone was gathered, the Defendant stood in the street and

to his right. He said that the Defendant was still in the street after he pulled Ms. Waters away from the crowd and dragged Cate behind a car. He said that he did not see the Defendant leave and that his focus was on helping Cate.

On redirect examination, Mr. Rucker testified that he gave two statements to the police on the night of the shooting. After reviewing the statements, he said he gave the statements at 11:30 and 11:49 p.m. and signed them both. He agreed the statements were "substantially similar" to each other and to his testimony. On recross-examination, he agreed both statements showed that he saw about twenty people "hustle . . . off" the Defendant.

Fred "Winky" Lee testified that he knew the Defendant from the neighborhood and that they had socialized previously. He said he attended the block party on May 31, 2007, with various friends and family. He said that the victim was his cousin and that the victim's nickname was Cate. He said that while he was at the party, a cup of beer hit his sister, Jessica Cheatham, in the face and that a "fight broke out" between "the girls." He denied fighting with anyone. He said that although he did not know what happened, he and the victim attempted to pull their family members away from the fight. He said that a lot of people were around and that everyone moved into the street. He stated that he was pushed or shoved in the back of the head and that when he turned around, he saw the Defendant, who placed a gun to his head. He said the Defendant waved the gun from side to side and asked, "What you hit my b---- for?" He said that he denied hitting anyone and that the Defendant removed the gun from his head and let him go. He said he began to leave and heard two gunshots.

Mr. Lee testified that he did not see anyone attack the Defendant and that no one would have attacked the Defendant because he had a gun. He said the Defendant had the gun after the fight with "the girls" ended. He said that although the girls were at the street when the Defendant pulled out the gun, no one was fighting at that time.

The Defendant testified that he and his girlfriend, Amanda Starnes, attended the block party on March 31, 2007. He said that a fight occurred between Ms. Starnes, Ms. Cheatham, Fred Lee, and Ms. Waters's daughter. He said he did not witness the fight but saw the crowd surrounding them. He said that the fight ended as he walked toward the crowd and that Ms. Starnes found him. He said that she was "all beat up" and that they decided to leave. He said that they began walking to his car, that he heard a gunshot, and that "everyone scattered." He said that just before he heard the gunshot, he saw Fred Lee, who yelled the Defendant "was going to be next." He denied witnessing the shooting and possessing a gun.

-7-

The Defendant testified that he arrived at the party with his friend named Greg. He said that although his sister was at the party, she drove separately. He denied having access to his sister's Lexus that night, having driven it recently, and having any belongings inside. He said he knew the victim from the neighborhood and denied having any problems or "hard feelings" with the victim regarding the fight between the girls. He denied having a reason to shoot the victim.

On cross-examination, the Defendant testified that no one thought his sister's Lexus belonged to him. He denied talking to Fred Lee about hitting his girlfriend and seeing Ms. Waters at the party. He said that he had left the party by the time the police arrived. He agreed he saw his sister at the party and denied she was involved in the fight. He did not know where his sister was when he left and did not recall when he last spoke with her before he left. He agreed the State's witnesses testified truthfully that Ms. Starnes was at the party, that his sister's car was at the party, that the victim was at the party, and that no one had a problem with the Defendant.

Tiwanna Staten, the Defendant's sister, testified that she and "one of her boyfriends" attended the block party on March 31, 2007. She said she drove her Lexus that night, but the Defendant came to the party with his girlfriend. She saw her brother at the party but said they did not spend much time together. She said a fight occurred between Ms. Starnes, Winky, and Winky's sister. She said that after the fight, she saw the Defendant in an argument with Winky. She saw a "little shuffle" between them. She said that everyone began to leave and that the Defendant and Ms. Starnes began walking to their car. She said she heard the gunshot seconds later.

Ms. Staten testified that the police placed crime scene tape around her Lexus and that she was not permitted to drive her car home. She denied leaving anything in her car that night. She said she knew most of the Lee family and did not know of any problems between the Defendant and the Lee family. She said that she knew the victim, that they were Facebook friends, and that they did not keep in touch. She denied the victim stated that he had problems with the Defendant.

On cross-examination, Ms. Staten testified that she talked to the victim through Facebook to determine if the case had been scheduled for trial. She agreed she became angry when she saw the police searching her Lexus at the scene. She said one of the police officers was rude to her, which also made her angry. She said that at the time, she did not know what was happening and did not understand why the police were searching her Lexus. She agreed she knew about the shooting at the time of the search. On redirect examination, she stated that her car was parked in the yard, not on the street.

Upon this evidence, the jury acquitted the Defendant of aggravated assault and convicted him of the lesser included offense of reckless aggravated assault. The trial court sentenced the Defendant to three years' confinement to be served consecutively to his previously imposed eighty-seven-month federal sentence. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to sustain his conviction for reckless aggravated assault. He argues that the State failed to prove beyond a reasonable doubt that he possessed and used a deadly weapon. The State responds that the evidence was sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Identity may be established with circumstantial evidence, and the "jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence. . . .'" *Id.* (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

Relevant to this appeal, "[a] person commits aggravated assault who recklessly commits an assault as defined in § 39-13-101(a)(1), and causes serious bodily injury to another; or uses or displays a deadly weapon." T.C.A. § 39-13-102(a)(2)(A)-(B) (2010).

Assault is defined as "intentionally, knowingly, or recklessly caus[ing] bodily injury to another." *Id*. § 39-13-101(a)(1) (2010). Reckless is defined as acting

> recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id*. § 39-11-106(a)(31) (2010). Serious bodily injury is defined as bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty, or a broken bone of a child who is eight (8) years of age or less." *Id*. § 39-11-106(a)(34).

Relevant to determining whether the evidence is sufficient, we note that the trial court erroneously instructed the jurors that reckless aggravated assault required them to find beyond a reasonable doubt that the Defendant "recklessly caused bodily injury to another and that the defendant used or displayed a deadly weapon." The Defendant notes this error but does not argue the error deprived him of his right to a jury trial. Rather, he argues that the error "narrowed the definition of . . . reckless aggravated assault" and required the jurors to find that the defendant "committed an assault that injured the victim . . . and that the defendant committed said assault with a deadly weapon."

To convict the Defendant of reckless aggravated assault, the jurors were required to find beyond a reasonable doubt that the Defendant recklessly assaulted the victim and either caused serious bodily injury or used or displayed a deadly weapon, but not both. We conclude that the erroneous instruction was in the Defendant's favor and that even with the erroneous instruction, the evidence shows that the Defendant assaulted the victim and used and displayed a firearm, a deadly weapon, and that the victim suffered serious bodily injury as a result of the assault.

In the light most favorable to the State, Wanda Waters went to the block party where the shooting occurred because her sister and daughter were involved in a fight with the Defendant's girlfriend. After the fight ended, Ms. Waters saw the Defendant hold a handgun to Fred Lee's head and ask, "Why'd you hit my b---- for." Ms. Waters saw the Defendant wave the gun around and fire it just before the victim was shot. Although the shooting occurred around dusk, the street lights were operating, and she could see the Defendant's

face. The victim testified that he knew who the Defendant was, that he saw the Defendant with a gun, that the Defendant waved the gun in the air and was aggressive, and that he heard two gunshots before realizing he was shot in the foot. Although he did not immediately know he had been shot, he saw the blood when he attempted to walk. Edward Rucker testified that although he did not see the Defendant shoot the victim, he saw the Defendant waving a gun from side to side just before hearing the gunshots. Fred Lee testified that just before the shooting, the Defendant placed a gun to his head and asked, "What you hit my b---- for?" Mr. Lee denied involvement in the fight between the women. He said that the Defendant let him go, that he started to leave the party, and that he heard two gunshots. The Defendant was the only person identified as displaying a gun the night of the shooting. Although no evidence exists showing that the Defendant shot the victim intentionally, the Defendant displayed a gun and pointed it at Fred Lee's head. We conclude that the evidence sufficiently shows that the Defendant assaulted the victim by shooting him in the foot and possessed and displayed a firearm, a deadly weapon. We also conclude that a rational trier of fact could find beyond a reasonable doubt that the Defendant was aware but disregarded the risk that someone might be shot as a result of his conduct.

Regarding serious bodily injury, the record shows that the victim underwent surgery to place metal plates and screws in his left leg and ankle. He stayed in the hospital three days. He testified regarding his pain and scars and showed the scars to the jury. The metal plates were slightly visible. The victim testified that he was unable to work for four months after the shooting. The medical records support the victim's testimony. Although the evidence sufficiently shows that the Defendant used or displayed a deadly weapon, the evidence also sufficiently shows that the victim suffered serious bodily injury. The Defendant is not entitled to relief on this issue.

## II

The Defendant contends that his right to a speedy trial was violated by the four-and-one-half-year delay between the night of the shooting and the trial. He argues that although he was serving a federal prison sentence in another state, the State failed to make a good faith effort to resolve the Williamson County criminal charge. The State responds that no speedy trial violation occurred. We agree with the State.

Upon the State's initiation of criminal proceedings, the right to a speedy trial is implicated under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. This right is statutory, as well, in Tennessee. T.C.A. § 40-14-101 (2006). In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court devised a balancing test to determine whether a defendant's right to speedy trial was violated and identified four factors for consideration: (1) the length of delay; (2) the reason for the delay;

(3) the defendant's assertion of his right to speedy trial; and (4) the prejudice to the defendant. *Id.* at 530. In *State v. Bishop*, 493 S.W.2d 81 (Tenn. 1973), the Tennessee Supreme Court implicitly adopted the *Barker* balancing test for our state's constitutional and statutory right to a speedy trial.

The record shows that the offense occurred on March 31, 2007, and that a preliminary hearing was held on June 19, 2007. The Defendant was indicted less than one month later on August 13, 2007. On September 27, 2007, McLemore Bonding Company filed a motion to surrender the Defendant, to set aside a conditional bail bond forfeiture, and to be relieved as a surety on the Defendant's bond because he had been apprehended in Davidson County on federal criminal charges on September 20, 2007. The trial court granted the motion.

On November 3, 2011, the trial court received a copy of an October 20, 2011 request from the Defendant that an "IAD be filed on [his] behalf" in the present case to "have [an] untried indictment taken care of for 'failure to appear on aggravated assault.'" The request was made when the Defendant was serving his federal prison sentence. On November 3, 2011, the court received an October 20, 2011 letter from the Federal Bureau of Prisons addressed to the District Attorney General informing her that the Defendant had requested disposition of the pending Williamson County charge under the Interstate Agreement on Detainers Act. The letter requested that her office take action and submit the "Prosecutor's Acceptance of Temporary Custody."

Although the record fails to show when the Defendant was transported from federal to state custody, on January 17, 2012, he completed an affidavit of indigency form in the trial court. Counsel was appointed but was permitted to withdraw on February 9, 2012, because of a conflict of interest in the public defender's office. By February 16, 2012, trial counsel had been appointed and had filed a motion for funds to obtain a transcript of the preliminary hearing. The court granted the motion. The Defendant filed pretrial motions on March 15 and 16, 2012, requesting that the court determine the admissibility of the Defendant's previous criminal convictions. The trial began on March 28, 2012, and ended the following day.

The first prong of the *Barker* inquiry is the length of the delay. In the present case, the Defendant was indicted on August 13, 2007, and the two-day trial began on March 28, 2012. A delay which approaches one year is sufficient to trigger further inquiry. *Doggett v. United States*, 505 U.S. 647, 652 (1992); *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997). The length of the delay in the Defendant's case is sufficient to evaluate the remaining *Baker* factors. We note that this delay does not, alone, weigh heavily against the State. *See State v. Wood*, 92 S.W.2d 341 (Tenn. 1996) (concluding thirteen-year delay not excessive).

-12-

The only reason for the delay that appears in the record was the Defendant's apprehension in Davidson County on federal criminal charges. The Defendant became a federal prisoner in September 2007 and was ordered to serve his eighty-seven-month sentence in an Illinois federal prison. According to the documents from the Federal Bureau of Prisons, the Williamson County Sheriff's Department had a detainer placed on the Defendant before he requested disposition of his pending state charge in 2011. As a result, we conclude the Defendant acquiesced to the delay. *See Wood*, 924 S.W.2d at 347.

Regarding the Defendant's assertion of the right, the record fails to show that he asserted his right to a speedy trial in the trial court, although he requested, through the Federal Bureau of Prisons, a disposition of the present case on October 20, 2011. The Defendant knew of the pending aggravated assault charge in September 2007 when he was apprehended in Davidson County but failed to assert his right to a speedy trial. He only requested disposition of the case four and one-half years after he was indicted.

We note that although the record fails to show when the District Attorney General received the October 20, 2011 letter requesting that her office act pursuant to the Interstate Agreement on Detainers Act, the record shows that by January 17, 2012, the Defendant had been transferred to Tennessee custody and was before the trial court requesting the appointment of counsel. The Defendant's trial began approximately two months and eleven days later. We note, too, that the trial began after counsel had sufficient time to obtain a transcript of the preliminary hearing and to file two pretrial motions regarding the Defendant's previous convictions.

Regarding the prejudice to the Defendant, the Defendant argues that the memories of many of the State's witnesses faded over time and that their trial testimony contradicted their preliminary hearing testimony. Although the passage of time may affect a witness's memory, the State's witnesses testified under oath at the preliminary hearing. We note counsel was provided funds to obtain a transcript of the preliminary hearing and used that testimony to refresh recollections and to impeach the State's witnesses at the trial. The jury determined the credibility of the State's witnesses. See *Bland*, 958 S.W.2d at 659. As a result, the record does not reflect that the delay affected the Defendant's ability to present his defense at the trial. Under these circumstances, we conclude that the Defendant has failed to establish a speedy trial violation. He is not entitled to relief on this basis.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE